UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ERIC NEWBERG,

                    Plaintiff,

vs.                                    Case No.  2:09-cv-625-FtM-36DNF

GEO  GROUP,  INC.,  and  FLORIDA
DEPARTMENT   OF   CHILDREN   &
FAMILIES,

                    Defendants.
_____


**OPINION AND ORDER**

**I. Status**

    This matter comes before the Court upon Defendant GEO's Motion
to Dismiss/Motion for Summary Judgment (Doc. #22, "GEO Motion").
Defendant GEO submitted the Affidavit of Timothy J. Budz with
attachments as an exhibit in support of its Motion (Doc. #22-1,
"Budz Affidavit").[1]  Plaintiff filed a Motion to Strike in response
to Defendant GEO's Motion, which is construed by the Court as a
response in opposition to GEO's Motion (Doc. #24, "Plaintiff's
Response").  Plaintiff subsequently filed a three-page pleading
entitled "Motion for Summary Judgment" (Doc. #25, "Plaintiff's
Motion").  Plaintiff's Motion basically reiterates the arguments
raised in his Response to GEO's and DCF's Motions.  Further,

_____
    [1]Defendant DCF filed a Motion to Dismiss the Amended Complaint
(Doc. #23, "DCF Motion").  GEO's Motion was filed before DCF's
Motion.  A favorable ruling on GEO'S Motion will deem DCF's Motion
moot.  Consequently, the Court considered GEO's Motion first.

Plaintiff's Motion fails to comport with the dictates of Federal Rule of Civil Procedure 56(c) and Local Rule 3.01(a). Therefore, the Court considers Plaintiff's Motion as a Supplement to his Response. Plaintiff did not attach any exhibits in support of his Response or his Supplement. The Court deems GEO's Motion ripe for review.

### A.   Amended Complaint[2]

Plaintiff is civilly confined to the Florida Civil Commitment Center ("FCCC") pursuant to the Involuntary Civil Commitment of Sexually Violent Predators' and Care Act, § 394.910, *et. seq.*, Fla. Statutes (the "SVP Act"). On September 19, 2009, Plaintiff initiated this action by filing a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 (Doc. #1). Plaintiff was granted permission to proceed in this action *in forma pauperis* (Doc. #5). Prior to the Court directing service, Plaintiff filed an amended

---

[2]Because the Amended Complaint contained no allegations against any of the named defendants in their individual capacities, the Court *sua sponte* construed the Amended Complaint as being brought against the respective entities that employed Defendants Lister and Kline, namely GEO and DCF, and dismissed the individually-named Defendants. *See* July 6, 2010 Order of Court (Doc. #10, "Order"). The Court noted that only Defendants Kline and Lister were identified by name in the Amended Complaint, and then, only in their respective official capacities. *See* Complaint at 3. Further, it is clear from the Amended Complaint that Plaintiff is challenging a custom or practice that existed at the FCCC at the time that Plaintiff filed his Amended Complaint, not the actions of any of the individual Defendants.

complaint (Doc. #8, Amended Complaint), which is the operative pleading in this case.

The Amended Complaint alleges violations to Plaintiff's First Amendment free exercise rights against Defendants GEO, Inc (GEO) and The Florida Department of Children and Families ("DCF"). *See generally* Amended Complaint. According to the Amended Complaint, GEO, the administrator of the FCCC, implemented a "Smoke Free" policy, which Plaintiff alleges infringed upon his ability to practice various aspects of his Native American faith. *Id.* at 6.

Plaintiff explains that the denial of any tobacco products at the FCCC prevents him from engaging in the Sacred Pipe Ceremony and Smudging. *Id.* at 2. Plaintiff avers that denying Native Americans the "use of tobacco for their prayer pipe" is essentially "denying the Natives the right to pray." *Id.* Additionally, Plaintiff states that GEO refuses to provide an outdoor area designated for Native Americans "to set up a Sacred circle for its rites and rituals," and for "a sweat lodge and fire pit." *Id.* at 7. Plaintiff alleges that he made efforts to resolve the tobacco issue with Charles F. Lister of GEO and Dr. Kline with DCF to no avail. *Id.* at 3, 7.

As relief, Plaintiff seeks declaratory and injunctive relief only. *Id.* at 8. Specifically, Plaintiff requests that (1) GEO be required to "recognize and respect" the religious rights of Native Americans and permit "the use of Sacred Tobacco" by the Native

Americans; (2) GEO provide a "secure area" for a "proper circle" to be used by the Native Americans; (3) GEO provide a "sweat lodge and fire pit"; (4) the Court "investigate" possible federal criminal charges against the Defendants under 42 U.S.C. § 1985; and, (5) GEO be required to "set aside funds" for the purchase of the various religious items. *Id.*

### B.   GEO's Motion

Defendant GEO does not dispute that "Plaintiff observes Native American practices" and has "firmly held spiritual beliefs." Motion at 5, ¶8.   Nonetheless Defendant GEO seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure[3] on the basis that: (1) all but one of Plaintiff's claims are moot due to the implementation of a new FCCC policy permitting Native American residents to smoke tobacco, smudge, and perform other Native American rites and ceremonies; and, (2) the FCCC has articulated a reasonable/compelling governmental interest to prohibit the construction of a sweat lodge, fire altar and fire pit.

---

[3]Because the Amended Complaint is devoid of any allegations as to Defendants Jorge Dominics, Timothy Budz, Dr. E. Hermann, Dr. Robin Wilson, Mr. Lorenz, or Major Baloff, Defendant GEO also seeks dismissal pursuant to Rule 12 on behalf of these Defendants.  As noted *supra*, the Court *sua sponte* dismissed Plaintiffs' claims against the individual named Defendants in its July 6, 2010 Order. *See* n. 2.

## II. Applicable Law

### A.   Motion for Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Moton v. Coward,* 631 F.3d 1337, 1341 (11th Cir. 2011)(internal quotations and citations omitted). *See also*, Fed. R. Civ. P. 56(c)(2). "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." *Moton*, 631 F.3d at 1341 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The standard for creating a genuine dispute of fact requires the court to "make all *reasonable* inferences in favor of the party opposing summary judgment," *Chapman v. Al Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc) (emphasis added), not to make all *possible* inferences in the non-moving party's favor.

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of persuasion" and must come forward with extrinsic evidence, *i.e.*, affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006)(citations omitted); *Celotex*, 477 U.S. at 322; *Hilburn v.*

*Murata Electronics North America, Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999).  If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences" must be drawn in favor of the non-moving party.  *Beard*, 548 U.S. at 529 (citations omitted); *Shotz v. City of Plantation, Fl.*, 344 F.3d 1161, 1164 (11th Cir. 2003).  "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted).  Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact.  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In the summary judgment context, however, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney.  *Loren v. Sasser*, 309 F.3d 1296, 1301 (11th Cir. 2002).

### B.   First Amendment/Free Exercise of Religion

As this is a § 1983 action, the initial inquiry must focus on the presence of two essential elements:

> (1) whether the person engaged in the conduct
> complained of was acting under color of state

> law; and (2) whether the alleged conduct
> deprived a person of rights, privileges or
> immunities guaranteed under the Constitution
> or laws of the United States.

*Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

Here, Plaintiff challenges a policy that is enforced at the FCCC,

a facility admittedly operated by GEO "via contract with the State

of Florida for the specific purpose of housing and providing

treatment to persons detained and committed as sexually violent

predators under the [SVP Act]." Budz Affidavit, ¶4. Plaintiff

contends that FCCC policy completely prohibits Native American

residents from using tobacco and "smudge" during their religious

prayer, and complains that the FCCC has denied Native Americans a

dedicated area to hold religious ceremonies. Amended Complaint at

2-4. Additionally, Plaintiff alleges that the Native American

religion "requires the use of a sweat lodge on a periodic basis,

for cleansing and purification," which requires a fire pit. *Id*. at

4. Consequently, liberally construing the Amended Complaint, the

Court finds that Plaintiff has articulated a violation of the Free

Exercise Clause of the First Amendment against persons acting under

color of state law.

The Free Exercise Clause of the First Amendment to the United

States Constitution, which is applied to the States through the

Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296,

303 (1940), provides:

> Congress shall make no law respecting an
> establishment of religion, or prohibiting the
> free exercise thereof . . . .

U.S. Const. Amend.I.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Ave v. City of Hialeah*, 508 U.S. 520*,* 532 (1993).  If a law is neutral and generally applicable, it does not violate the Free Exercise Clause, even if the law has an incidental effect on a religious group or practice.  *Id.*, at 531.  To determine neutrality and general applicability, the Court looks at the purpose or object of the law, by viewing its text.  *Id.*, at 532.

### III.  Findings of Undisputed Facts and Conclusions of Law

### A.  Smoking, Smudge and Religious Grounds Claims Are Moot

GEO presents evidence that the FCCC Chaplain submitted a report to the administration, in May 2009, requesting that GEO change its current policy at the FCCC dealing with Native American religious practices.  Budz. Aff., ¶8.  The Chaplain recommended that GEO "adopt the Florida Department of Corrections policies" concerning the practices of "Smudging" and the use of the "Sacred Pipe Ceremony." *Id*.  As a result, since the filing of the Amended Complaint, GEO enacted policy PRG-26 entitled "Guidelines for Native American Religious Observances," effective on July 20, 2009, at the FCCC.  *Id.*, ¶9.  A copy of the newly enacted policy is attached as Exhibit A-2 to Mr. Budz' Affidavit.  The policy sets forth specific guidelines for implementing The Sacred Pipe

Ceremony, Smudging, Control of Ceremonial Pipe/Sacred Items, Group Worship, and Basic Beliefs.  *Id.*  In pertinent part, the following changes have occurred as a result of the newly adopted policy:

> The FCCC now allows Native American residents to participate in the "Sacred Pipe Ceremony" and smoke ceremonial tobacco at each of their regular and special ceremonies.  Indian tobacco, herbs, prayer pipes, and other ceremonial supplies are purchased online from a Native American retailer (www.crazycrow.com) for this purpose through a combination of resident and facility funds. The tobacco and herbs are securely maintained by the Chaplin between ceremonies.

The FCCC now allows Native American residents to participate in the ceremonial act of "Smudging" (the purification and cleansing with smoke from smoldering sage, sweet grass, cedar, or kinnik-kinnik) at each of their regular and special ceremonies.

*Id.,* ¶10(a)(b). In addition to permitting the use of the sacred pipe and smudging, GEO provides evidence that:

> The FCCC allows Native American residents to meet, outdoors, three times a week for ceremony and spiritual prayer.  These meetings generally consist of two daytime meetings (from 2:30 to 4:00 p.m.) and one evening meeting (from 6:30 to 8:30).  In addition to these regular meetings, Native Americans are allowed additional meetings on days of unique spiritual importance - such as a New Moon. Native Americans at the FCCC are also permitted to hold two "Pow-Wows" a year which can each last a full day.

> The FCCC has set aside designated grounds for the Native American community to hold ceremonies outdoors.  At this location, Native American's have erected a Prayer Circle of their own design prescribed by landmarks such as plants, stones, and dirt.

*Id.,* ¶10(c)(d).  As a result of the aforementioned policy changes at the FCCC, GEO submits that Plaintiff's claims regarding the prohibition against tobacco, smudging and unavailability of a

designated area for religious ceremonies are moot and must be dismissed.  The Court agrees.

"If a suit is moot, it cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it.  [ ] Mootness can occur due to a change in circumstances, or . . . a change in the law." *Seay Outdoor Adver., Inc. v. City of Mary Esther, Fla.*, 397 F.3d 943, 946 (11th Cir. 2005)(internal citations omitted); *Troiano v. Supervisor of Elections in Palm Beach County, Florida*, 382 F.3d 1276, 1281 (11th Cir. 2004).  A case is moot when the issue presented is no longer live, the parties lack a legally cognizable interest in its outcome, or a court decision could no longer provide meaningful relief to a party. *Troiano*, 382 F.3d. at 1281-82.  An amendment or repeal of a law generally moots constitutional challenges to the original law, *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000), unless "there is a substantial likelihood" that the challenged action will be reinstated. *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1334 (11th Cir. 2005).  Further, "when the defendant is not a private citizen but a governmental actor, there is a rebuttal presumption that the objectionable behavior will **not** recur." *Troiano*, 382 F.3d. at 1283 (emphasis in original).  Whether a case is moot is a question of law, *id.* at 1282, and the party urging dismissal bears the heavy burden of establishing mootness. *Beta*

*Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009).

Because mootness is about the Court's power to hear a case, Rule 12(b)(1) provides the proper framework for evaluating Defendants' Motions. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007). Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a claim (or, indeed, an entire lawsuit) on the ground that the Court lacks subject matter jurisdiction. Jurisdiction may be attacked facially or factually. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n. 5 (11th Cir. 2003). Facial attacks challenge the court's jurisdiction based on the allegations in the complaint, which the court accepts as true. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). On the other hand, factual or substantive attacks challenge the "existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." Id. In such a challenge a "'trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case without presuming the truthfulness of the plaintiff's allegations.'" *Makro Capital of America, Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008)(quoting *Amway Corp.*, 323 F.3d at 925).

Based upon the Affidavit of Timothy Budz and the exhibits attached thereto, subsequent to the filing of this action, the FCCC

enacted and implemented specific policies that now permit Native Americans to participate in the Sacred Pipe Ceremony and Smudging, which utilize tobacco, sage, cedar, sweet grass and kinnik-kinnik. Further, FCCC has established specific time periods to ensure that Native Americans can observe and participate in religious ceremonies outside on grounds designated for use only by the Native Americans.  Plaintiff has not presented any evidence that GEO intends on withdrawing any aspect of the newly enacted policy. *See Nat'l Adver.*, 402 F.3d at 1334 (recognizing that a plaintiff has a heavy "burden of presenting affirmative evidence" that a state actor might reenact a challenged policy).

The Court finds Plaintiff's First Amendment free exercise claims premised on: (1) GEO's prohibition of tobacco which prevents Plaintiff from the ability to engage in the Sacred Pipe Ceremony and Smudging; and, (2) GEO's refusal to provide an area for the Native Americans to set up a Sacred circle for its rites and rituals are moot.  Consequently, the Court dismisses these claims.

**B.   <u>Sweat Lodge/Fire Pit Claim</u>**

GEO acknowledges that Plaintiff's claim that GEO's prohibition against a sweat lodge and fire pit violates Plaintiff's First Amendment free exercise rights is not moot.  However, GEO contends that under either the reasonable relationship test or the compelling interest test, the construction of a sweat lodge and fire pit "poses an unreasonable dangerous risk to the facility, to

staff, and to other residents" and; therefore, is properly prohibited. GEO Motion at 7, ¶13.

GEO presents evidence that its decision to prohibit a sweat lodge and fire pit at the FCCC was reached only after considering the following safety and security concerns:

> The danger associated with permitting open fires on facility grounds.
>
> The danger associated with allowing residents extended access to an unobservable area - the area inside the sweat lodge. While inside the lodge, residents would not be visible to security staff and could engage in a variety of illegal or dangerous conduct such as illegal drug use or sexual misconduct. The situation would also pose an unreasonable danger of unobserved physical assault or violence.
>
> The danger associated with allowing residents access to dangerous items such as burning hot rocks, open flames, fire-wood, fire pokers, shovels, and other related tools.
>
> The danger to participants posed by the ceremony itself. This includes the dangers associated with prolonged exposure to the conditions present in a sweat lodge such as heat stroke, dehydration, smoke inhalation, and suffocation. Participants are also exposed to danger/injury through the necessary acts of tending a fire, handling firewood and large hot rocks, and creating hot steam.
>
> The fact that construction of a sweat lodge may create a high degree of discord and unrest among other residents who would not be allowed to use the sauna type lodge and who may view Native Americans as receiving preferential treatment.

Budz Aff., at ¶11(a)-(e). The expense associated with constructing a sweat lodge was an additional factor considered by GEO. *Id.*, ¶12. In addition to the actual costs incurred with constructing a sweat lodge, GEO also would incur expenses associated with

constructing a new fenced area within which the sweat lodge itself would be situated, as well as storage facilities where equipment and firewood could be maintained. *Id.* Moreover, GEO would have to increase its staffing budget, due to the need to provide additional manpower to oversee the area whenever sweat lodge ceremonies took place. *Id.* Based on the various security concerns and additional costs, GEO argues that it is entitled to summary judgment as a matter of law. *Id.* at 12, 14.

Plaintiff does not present evidence, other than his own opinions, to refute the security concerns identified by GEO. *See generally* Response and Supplement to Response. Plaintiff disputes that a sweat lodge poses any security issues because GEO successfully runs sweat lodges at "numerous Federal prisons." Response at 3. Further, Plaintiff argues that he should be "afforded religious practices in the same manner as a mental health patient." *Id.* Plaintiff also claims that the Eleventh Circuit "determined that the State of Alabama must provide sweat lodges in their prison system." *Id.* at 4.[4]

### 1.   Rational Basis/Reasonable Relationship Standard

---

[4]Plaintiff declares that the Native American Sponsor, Mr. Tony Stonehawk, has agreed to donate the items necessary to build the sweat lodge. Response at 6. Plaintiff, however, does not attach any evidence of this fact, such as Mr. Stonehawk's affidavit. Additionally, Plaintiff for the first time, claims that GEO permits "the Druid community to have an open fire at their ceremonies." *Id.* at 4. The Court will not address Plaintiff's newly asserted claim, which appears to allege an equal protection claim, because it is not raised in his Amended Complaint.

Due to the unique circumstances created by imprisonment, regulations that substantially burden an inmate's First Amendment free exercise rights are evaluated under a reasonableness test, which balances the right of the prisoner with the interests of prison officials who are tasked with administering the penal system. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Turner v. Safely*, 482 U.S. 78, 89 (1987).

This Court is cognizant that Plaintiff is civilly committed, the FCCC is not a prison, and Plaintiff is not a prisoner. *Troville v. Venz*, 303 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has recognized that an individual who has been involuntarily civilly confined has liberty interests under the Due Process Clause of the Fourteenth Amendment that "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg v. Romeo*, 457 U.S. 317, 319 (1982). Thus, the Supreme Court has opined that, at least in regards to certain aspects of their confinement, civil detainees are afforded a higher standard of care than those who are criminally committed.[5] *See Id.* at 321-322; *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996)(holding that "persons subjected to involuntary civil commitment are entitled to more considerate treatment and conditions of confinement than criminals whose

_____

[5]In *Youngberg*, the issue was whether a severely retarded young man had received proper treatment in a state facility. *Id.* at 309.

conditions of confinement are designed to punish."). *See also Lavender v. Kearney*, 206 F. App'x 860, 863 (11th Cir. 2006).

By way of background, the State of Florida enacted the SVP Act by which a person determined to be a sexually violent predator[6] is required to be housed in a secure facility "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. § 394.917(2). The SVP Act was promulgated for the dual purpose "of providing mental health treatment to sexually violent predators and protecting the public from these individuals." *Westerheide v. State*, 831 So. 2d 93, 112 (Fla. 2002)(emphasis added). In its statement of "findings and intent," the State legislature said that the SVP Act was aimed at "a small but extremely dangerous number of sexually violent predators . . . who do not have a mental disease or defect that renders them appropriate for involuntary treatment under the Baker Act (§ 394.451- § 394.4789, Fla. Stat.)." Fla. Stat. § 394.910.

---

[6]A "sexually violent predator" is defined by the Act as any person who:

(a) Has been convicted of a sexually violent offense; and

(b) Suffers from a mental abnormality or personality disorder that makes the person more likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment.

Section 394.912(10), Fla. Stat. (2008).

Thus, Plaintiff has been confined against his volition to a "secure facility" pursuant to the SVP Act upon a probable cause determination that Plaintiff meets the statutory definition of a sexually violent predator, due to his previous state conviction for a sexually violent offense. *See* Fla. Stat. § 394.910.  In other words, the FCCC is a place of involuntary confinement for persons who have demonstrated a disposition for sexually deviant and violent behavior.  The need to curtail potentially violent conduct is an "obligation" incumbent upon the operators of the FCCC. *Washington v. Harper*, 494 U.S. 210, 225 (1990) (stressing that the state has not only an interest, but an obligation, to combat any danger posed by a person to himself or others, especially in an environment, which "by definition is made up of persons with a demonstrated proclivity for antisocial criminal, and often violent, conduct." (internal quotations and citations omitted)).

Staff at the FCCC are tasked with the arduous task of rendering treatment consistent with the goals of the SVP Act while ensuring the safety of not only themselves and other administrative personnel, but of all residents who are confined at the FCCC.  The Supreme Court has recognized that the "interest in institutional security" and "internal security" is "paramount."  *Hudson v. Palmer*, 468 U.S. 517, 528 (1984).  *See also Cutter v. Wilkinson*, 544 U.S. at 722 (stating that even the more stringent standard

mandated by RLUIPA[7] cannot "elevate accommodation of religious observances over an institution's need to maintain order and safety."). The Court is also aware of the numerous complaints that have been filed before it which contain allegations of resident on resident attacks, resident attacks on staff, sexual assaults on residents by other residents, and other acts of inappropriate sexual misconduct.

Although Plaintiff is not a prisoner and despite the Eleventh Circuit's cautionary language in its unpublished decision in *Marsh v. Fla. Dep't of Corrections*, 330 F. App'x 179 (11th Cir. 2009),[8] the Court finds the context in which Plaintiff is civilly detained should be afforded significant consideration in this case before the Court. Further, the Court notes that the unpublished decision in *Marsh* is only persuasive authority and is not binding precedent

---

[7]The Religious Land Use and Institutionalized Persons Act, "RLUIPA" provides that, in programs that receive federal funding, "[n]o government shall impose a substantial burden in the religious exercise" of an institutionalized person unless the government demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000cc-1(a). Courts evaluating RLUIP claims apply the governmental interest/least restrictive means test. *See Cutter v. Wilkinson*, 544 U.S. 709 (2005). The Amended Complaint does not allege a RLUIPA claim.

[8]While the *Marsh* Court opines that a resident at the FCCC is "arguably entitled to more protection that a criminal prisoner with regard to his First Amendment free exercise claim," *Marsh,* 330 F. App'x at 182, the opinion does not shed light on what standard would be applicable to residents who, albeit not criminals, are involuntarily committed due to their propensity to commit violent sexual acts, as opposed to having a mental disease. *See* Fla. Stat. § 394.910.

pursuant to Eleventh Circuit Rule 36-2. Additionally, the law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility. Thus, while Plaintiff as a civil detainee may not be subjected to conditions that amount to punishment, *Bell v. Wolfish*, 441 U.S. 520, 536 (1979), he nonetheless may be subjected to conditions within the bounds of professional discretion that place restrictions on his personal freedoms. *Youngberg*, 457 U.S. at 321-22. GEO, although not the operator of a prison, is tasked with making numerous decisions and implementing policy regarding the FCCC's administration that GEO is better equipped to make than the Court. The "recognition that prison authorities are best equipped to make difficult decisions regarding prison administration" was the cornerstone of the Supreme Court's decision in adopting the reasonable relationship test. *Turner*, 482 U.S. at 84-85; *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 228 (1977); *Washington v. Harper*, 494 U.S. at 223-24. Indeed, the Third Circuit, considered the status of a SVP civilly committed resident to that of a prisoner when analyzing the institution's policies governing inspection of a resident's mail and adopting the *Turner* analysis to evaluate the resident's First Amendment rights. *See Rivera v. Rogers*, 224 F. App'x 148, 151 (3d Cir. 2007)(unpublished). Thus, the Court is not persuaded by

Plaintiff's argument that the Court should analogize his status to that of a mental health patient who is hospitalized, when evaluating the FCCC's prohibition against a sweat lodge.

Instead, in order to properly balance Plaintiff's liberty interests against the relevant state interests and afford deference to the professional judgments of qualified FCCC staff as required by *Youngberg*, the Court finds that, in the instant case, the *Turner* standard is the proper standard to be applied in evaluating Plaintiff's First Amendment free exercise claim.[9]  In evaluating a claim under the *Turner* test, the Court should consider the following factors:    (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on facility staff, other residents and the allocation of the

---

[9]"Essentially, the First Amendment analysis under *Turner* mirrors the due process analysis under *Youngberg*; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside." *Graham v. Main*, Case No. 10-5027(SRC), 2011 WL 2412998 at *13 n.11 (D.N.J. 2011)(citing *Bealulie v. Ludeman*, Case No. 07-cv-1535 (JMR/JSM), 2008 WL 2498241, at *20 n.15 (D. Minn. 2008)(finding *Turner* to be consistent with *Youngberg* because "it will not allow a Program detainee's rights to be restricted unless there is a valid institutional reason for doing so.").

facility's resources generally;[10] and, (4) whether the regulation represents an "exaggerated response" to the facility's concerns. *Turner*, 482 U.S. at 89-91; *Hakim v. Hicks*, 223 F.3d 1244, 1247-48 (11th Cir. 2001).

Based upon the record, the Court finds that the challenged FCCC prohibition against permitting a sweat lodge at the FCCC is reasonably related to a legitimate security interest. *Wilson v. Moore,* 270 F. Supp. 2d 1328 (N.D. Fla. 2003)(security reasons justified prison officials' refusal to permit construction and use of sweat lodge by Native Americans and thus, did not violate Native American's First American Free Exercise rights). It is undisputed that the policy is aimed at permitting a condition to exist on the FCCC grounds that officials deemed to be "a potential security threat to staff and other residents at the facility." Budz Affidavit at 3, ¶11. Plaintiff is not otherwise prohibited from practicing any other component of his faith, or engaging in other Native American religious rituals and rites. *Id.* at ¶10. Despite Plaintiff's unsupported protestations that no resident would view the sweat lodge as a sauna, the Court can envision how the erection of a sweat lodge would be viewed as disproportionately favoring the Native American residents and create hostilities among the other

---

[10] The Court must also consider the "ripple effect" of any accommodation. *See Turner*, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.")

residents. *Id*. at ¶11 (e). Further, the Court finds the fact that the sweat lodge prohibits its occupants from being viewed raises grave security issues and concerns, including affording a place to hide contraband, and no means for the FCCC staff to monitor prohibited resident behavior. Plaintiff has not come forward with any evidence to counter Defendant's proof. Thus, based upon the record and for the reasons set forth above, the Court finds that Defendant GEO is entitled to summary judgment on Plaintiff's First Amendment free exercise claim under the reasonable relationship test.

### 2. Compelling Interest Test

In the alternative, and based upon the Eleventh Circuit's unpublished *Marsh* decision, the Court will next consider Plaintiff's claims under the more rigorous standard of the compelling governmental interest.[11] Due to the numerous exceptions that have developed over the years to the compelling state interest test set forth in *Sherbert v. Verner*, 374 U.S. 398, 406 (1963), Congress eventually adopted the RLUIPA to ensure that the compelling interest test applies to government action that substantially burdens an individual's free exercise rights. To establish a *prima facie* case under the RLUIPA, plaintiff must show: (1) that he engaged in a religious exercise, and (2) that the

---

[11]Defendant GEO argues that under either the reasonable relationship or the more stringent compelling interest test Plaintiff's First Amendment claim fails. GEO Motion at 14.

religious exercise was substantially burdened by a government practice. *Muhammad v. Sapp,* 388 F. App'x 892, 895 (11th Cir. 2010)(unpublished). A substantial burden has been found when a regulation has "a tendency to coerce individuals into acting contrary to their religious beliefs," *Lying v. Northwest Indian Cemetery Protective Ass'n*, 484 U.S. 439, 450 (1988), or when the government places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987). Plaintiff bears the burden of demonstrating a substantial burden and it requires something more than an "incidental effect" or an "inconvenience" on a religious exercise. *Midrash Sephardi v. Town of Surfside,* 366 F.3d 1214, 1225 (11th Cir. 2004).

Applying the law to the facts before the Court, the Court finds that Plaintiff has failed to sustain his burden of demonstrating that the prohibition of a sweat lodge imposed a substantial burden on his Native American religion practice. Plaintiff avers that the sweat lodge affords him the ability "for cleansing and purification." Amended Complaint at 4.

Here, the record reveals that the FCCC affords Plaintiff the ability to practice the tenets of his faith by permitting him to participate in the Sacred Pipe Ceremony and Smudging. The FCCC has established specific times, three times a week, for Native Americans to gather as a group for religious ceremonies, and has

permitted additional ceremonial time for other spiritual holidays, as well as two Pow-Wows.  Finally, the FCCC has set aside designated grounds for the Native American community where a Prayer Circle has been erected.  According to the documentation presented by GEO, "[t]he use of the Sacred Pipe is of the utmost importance to spiritual observance."  Exh. A-1 at 10.  Additionally, "[v]arious plants, such as sage, cedar, sweet grass, and bitterroot are used to cleanse and purify by 'washing' one's self or one's sacred objects in the smoke."  *Id*.  "[S]mudging represents 'ceremonial cleansing' to those who practice."  *Id*. at 12. Plaintiff's ability to participate in the Sacred Pipe Ceremony and Smudging affords Plaintiff the ability to pray and to cleanse pursuant to his religious tenets.  Thus, GEO's prohibition against a sweat lodge is an "incidental effect" or "an inconvenience" on Plaintiff's religious exercise, which is insufficient to demonstrate a substantial burden.  *Midrash Shephardi, Inc. at* 1227.

Even if Plaintiff can demonstrate that the prohibition of a sweat lodge is a substantial burden on his faith, based upon the record and applicable law, the Court finds that Plaintiff's claim nonetheless fails as a matter of law.  Defendant GEO refers the Court to the Eight Circuit's decision in *Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), in which the court evaluated whether a penal institution's prohibition against a Native American sweat lodge violated the RLUIPA.  GEO Motion at 14.

The plaintiff in *Fowler,* who was a Native American inmate serving a life sentence at a maximum security prison, filed a civil rights complaint alleging that the Missouri State prison official's prohibition of a sweat lodge on the prison grounds denied him his First Amendment free exercise rights under the RLUIPA.   After providing a detailed description of what is required to erect a sweat lodge and explaining the ceremonial activities held therein,[12]

---

[12]The description, although more detailed, is strikingly similar to Plaintiff's description found in his Response at pages 5-6.

Willow poles form the structure of a sweat lodge. Participants place several poles, 1 1/2 inches in diameter and 14-16 feet long into the ground and bend them to create a domed structure held together by a small cord.  The size of the completed lodge is approximately 4 feet high and 8-10 feet wide, accommodating 12-15 individuals.   Blankets or tarps cover the entire structure to contain heat and dark.  In the center of the lodge, a depression approximately 3 feet wide and 2 feet deep is designed to hold several cantaloupe-sized rocks. The dirt from the depression is placed outside the entrance of the lodge to form an altar mound.

Directly beyond the altar mound is a fire pit.  The pit rests 12-15 feet outside the lodge's entrance and measures approximately 5-6 feet by 4 feet.  Firewood is stacked in the pit.  The rocks are placed on the firewood and the wood is lit. Once the rocks are hot, a participant carries 7-10 rocks, depending on their size, to the lodge entrance with a shovel or pitchfork.   The ceremony's facilitator receives the hot rocks using a pair of deer antlers and places them in the depression at the center of the lodge.

A sweat lodge typically consists of four rounds. Participants enter the lodge wearing only shorts, or a towel wrapped around their waist.  A round begins when the hot rocks are placed in the depression and the

(continued...)

the court held that the correctional official's decision to prohibit a sweat lodge at the prison was in furtherance of a compelling governmental interest, stating:

> no reasonable jurist, affording due deference to prison officials, can dispute that serious safety and security concerns arise when inmates at a maximum security prison are provided ready access to (1) burning embers and hot coals, (2) blunt instruments such as split wood and large scalding rocks, (3) sharper objects such as shovels and deer antlers, and (4) an enclosed area inaccessible to outside view.

*Id*. at 939.

Likewise, the security concerns identified by GEO are equally significant, especially in the context of an institution like the FCCC. Plaintiff's assertion that the Eleventh Circuit mandated the State of Alabama to permit sweat lodges is inaccurate. Plaintiff

---

[12](...continued)
> doorway flap is closed. The facilitator intermittently pours water containing sage, cedar, and/or sweetgrass over the rocks to produce steam, heat and humidity. During each round, the participants engage in a prescribed set of songs and prayers. Participants may smoke the ceremonial pipe during the round.

> A round takes from 30 minutes to an hour to complete. Upon completion of a round, the doorway flap is raised and additional hot rocks and water are brought into the lodge. A new round then begins. The typical number of rocks used during the ceremony is 30-40. The entire ceremony typically takes 6-7 hours to complete. To conclude the ceremony, participants exit the lodge and remove the blankets or tarps from the willow pole structure. The fire is burned down and sacred objects are stored for safekeeping. The lodge's skeletal structure remains standing.

*Fowler*, 534 F.3d at 934.

does not direct the Court to the case upon which his assertion is based, and research has identified only one case in which the issue of sweat lodges in the Alabama prisons was discussed by the Eleventh Circuit. *See Lathan v. Thompson*, 251 F. App'x 665 (11th Cir. 2007)(unpublished). In *Lathan*, the Eleventh Circuit in an unpublished decision held that the inmates' claim challenging a policy prohibiting sweat lodge ceremonies under the RLUIPA was moot because the Alabama Department of Corrections had "changed its policy" and permitted Native Americans to participate in sweat lodge ceremonies four times a year. *Id*. at 666. Moreover, the fact that other penal institutions may permit sweat lodges does not *ipso facto* mandate that sweat lodges be built at all other institutions. *Spratt v. Rhode Island Dept. of Corrections*, 482 F.3d 33, 42 (1st Cir. 2007)(recognizing "prison officials are infinitely more familiar with their own institutions than outside observers . . . and that as such, evidence of policies at one prison is not conclusive proof that the same policies would work at another institution."(internal quotations and citations omitted)). Security issues are unique to each institution just as the differences among institutions vary with respect to population, physical and geographical characteristics, staffing, and budgeting.

Based upon the record and for the reasons previously addressed in the reasonable relationship analysis above, in the alternative, the Court finds that Defendant GEO is entitled to summary judgment

on Plaintiff's First Amendment free exercise claim under the compelling interest test.

## C. Conspiracy Claim

The Court finds the Amended Complaint fails to articulate a conspiracy claim under § 1985.  To establish a conspiracy claim, Plaintiff "must show an agreement between 'two or more persons' to deprive him of his civil rights." 42 U.S.C. § 1985(3), *interpreted in Dickerson v. Alachua County Com'n,* 200 F.3d 761, 767 (11th Cir.), *cert. dismissed,* 530 U.S. 1285 (2000).  Plaintiff's Amended Complaint is devoid of any factual allegations that support a conspiracy claim.  Indeed, Plaintiff only raises his claim of conspiracy under his paragraph for "relief" in which he requests that the Court order an investigation.  Amended Complaint at 8. Consequently, the Court finds that, to the extent that Plaintiff was attempting to assert a conspiracy claim under § 1985, the claim must be dismissed.

ACCORDINGLY, it is hereby

**ORDERED:**

1.  Plaintiff's Motion to Strike (Doc. #24) is construed as a response in opposition to Defendant GEO's Motion to Dismiss/Motion for Summary Judgment.  Plaintiff's Motion for Summary Judgment (Doc. #25) is construed as a supplement to Plaintiff's Response, and Plaintiff's respective motions (Docs. ##24-25) shall be terminated from the pending motions report.

2.   Defendant GEO's Motion to Dismiss for Mootness/Motion for Summary Judgment (Doc. #22) is **GRANTED** for the reasons set forth above.

3.   Defendant DCF's Motion to Dismiss (Doc. #23) is **terminated as moot.**

4.   The Clerk of Court shall enter judgment accordingly, terminate any pending motions, and close this file.

**DONE AND ORDERED** at Fort Myers, Florida, on this 27th day of June, 2011.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

SA: hmk
Copies: All Parties of Record